IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TRIPLE TEE GOLF, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 4:04-CV-302-A |
| | § | |
| NIKE INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION
and
ORDER

Came on for consideration the motion of defendants, Nike, Inc., ("Nike"), Tom Stites & Associates formerly d/b/a Impact Golf Technologies, Inc., and John Thomas Stites, III, (Stites") for summary judgment. The court, after having considered the motion, the response of plaintiff,[1] Triple Tee Golf, Inc., defendants' reply, plaintiff's sur-reply, the evidentiary material submitted by the parties in support of their respective positions, the record, the proceedings conducted in this action on July 6, 2005, and applicable authorities, concludes that the motion should be granted except as to the claims related to the fifth alleged trade secret.[2] And, based on the stipulation the

---

[1] Plaintiff's response is titled "Opposition to Defendants' Motion for Summary Judgment."

[2] The court notes that plaintiff also filed a motion to strike arguments and evidence concerning alleged prior art as well as objections to summary judgment evidence. The court is not ruling specifically on the motion or objections, but, instead, is giving the summary judgment arguments and evidence whatever weight, if any, they
(continued...)

parties filed July 8, 2005, the court concludes that there should be a dismissal with prejudice of plaintiff's claims related to the fifth alleged trade secret.

I.

Plaintiff's Complaint

Plaintiff filed its original complaint on January 21, 2004, in the Southern District of Florida, and venue was subsequently transferred to this court.  After conducting a telephone conference on May 9, 2005, the court denied plaintiff's motion for leave to amend its second amended complaint, but it allowed plaintiff to file an amended complaint consistent with the rulings made during said telephone conference.  Plaintiff filed its third amended complaint on May 10, 2005, and it remains its active pleading.  In its third amended complaint, plaintiff asserts claims for: (1) in Count I, misappropriation of trade secrets; (2) in Count II, breach of confidential relationship; (3) in Count III, breach of implied contract; (4) in Count IV, negligent misrepresentation; and (5) in Count V, deceptive trade practices.

Basically, plaintiff contends that Nike has wrongfully used in golf clubs manufactured and sold by it trade secrets that were disclosed in confidence by John P. Gillig ("Gillig"), the president and principal owner of plaintiff, to Stites.  Plaintiff

---

[2](...continued)
may deserve.

2

alleges that Stites, in violation of the confidential relationship he had with Gillig, disclosed the trade secrets to Nike. All of plaintiff's claims relate to, and grow out of, the misappropriation of trade secrets claims.

## II.

### Trade Secrets at Issue

The seven alleged trade secrets in this action, as defined by Plaintiff's Supplemental Response to Interrogatory No. 1, are as follows:

> (a) The first trade secret of the Plaintiff was for an adjustable weighting system in a "hollow back" club, so the distribution of weight in the golf club head could be changed to obtain a desired flight path and distance of a golf ball. The Plaintiff contemplated this could be accomplished through one of three methods: (1) use of an existing sole plate, with a distinct weight distribution, and fixed by Allen screws or other means, could be removed or replaced by a new sole plate with a different weight distribution, (2) insertion of additional weight into the hollow of the club, or the sole, to obtain a different weight distribution, and (3) use of weighted metal bands, with a distinct weight distribution, spanning across the hollow, but inside the outside boundary of the club head, fixed by Allen screws or other means, that could be removed or replaced by a metal band with a different weight distribution.
>
> (b) The second "trade secret" is that a peripheral band could be placed around the perimeter of the hollow to secure in place either inserted weights, as set forth in number (2) above, or the metal bands, in number (3), as set forth above.
>
> (c) The third "trade secret" is a twenty-seven (27) point weighting system on a three dimensional x, y, and z coordinate system within the space of the "hollow back" golf club head, and secured with one of the methods set forth above. There would be three weight boxes along the front of the face, from left to

3

right along the y axis, three weight boxes from the bottom of the club head to the top of the club head along the z axis, and three weight from the front of the club head to the rear of the club head along an x axis, to create one or more of twenty-seven (27) weighted coordinates in the three-dimensional space of the "hollow back" club.  The adjustable weights, as set forth above, would be changed in the twenty-seven (27) point weighting system to obtain different weight distributions in the club head, to alter the flight of the golf ball when struck to the accommodate the desires and needs of the golfer.  At all times, the weights and weighting system would stay within the perimeter of the club, as delineated by the peripheral bands, to comply with all rules and regulations of golfing.

(d)  The fourth "trade secret" is a system to analyze the swing of a golfer to determine any defect thereof, and whether the optimal striking point ("sweet spot") on the face of the golf club should be adjusted by utilizing the twenty-seven (27) point weighting system to produce the distance and flight path of the golf ball desired by the golfer. The golfer's swing would be captured by video, and then processed through a computer program, to be written and developed by qualified programmers, to analyze the golf swing, and determine the placement of the twenty-seven (27) point weighting system to correct the swing, or to produce a desired flight path or distance of the golf ball, by positioning of the optimal striking point ("sweet spot") on the face of the golf club.

(e)  The fifth "trade secret" is a naming or designation system for golf clubs.  Instead of designation of a "1 Wood" or a "4 Iron" or a "Pitching Wedge" or a "Putter," the golf clubs would be named or designated through lofts and description of the purpose for the club.  For instance, a club may be designated as a "22° Driver," or a "26° Fairway Iron," etc.

(f)  The sixth "trade secret" builds upon the concept described in the fifth "trade secret."  The sixth "trade secret" is to move away from a standardized set of golf clubs with a set number of woods/drivers, a set number of irons, a set number of wedges, and a putter, with a uniform weight distribution throughout the set of clubs.  The new set of golf clubs would be assembled using

4

non-uniform/different weight distributions, as set forth above, to achieve different flight paths, distances, and purposes.  The twenty-seven (27) point weighting system would be combined with different lofts to enable the golfer to choose specific clubs for specific needs and desires for his game.  The golfer could choose as many, or as little a number, clubs as he wanted to complete a set of golf clubs. All of the golf clubs would be branded the same, and designated or named using the naming system set forth above.  The lofts that are available to the golfer would be in 2° increments.  This will, by its very nature, create golf clubs with non-standard loft.  One example of this type of club, that was envisioned by the Plaintiff, was a 22° Driver.

(g)  The seventh "trade secret" is the way in which all of the foregoing ideas would be marketed toward the general public as one coherent system. The first target consumer would be children and junior golfers, because there were no major golf club manufacturers who directed sets of clubs toward junior golfers.  The junior golfer would be provided a set of clubs with just the basic "hollow back" golf club head. Instead of a set of golf clubs with a large number of clubs to understand, the basic junior set would contain only a few clubs, for designated purposes, with different lofts, as set forth above.
The next target consumer would be the parents of the junior golfer, who are a combination of beginning, high handicap, or low handicap golfers.  This "trade secret" contemplates that the parents of the junior golfers observe their children experiencing success with the system of golf clubs and will want to use a comparable system themselves to accomplish a better game of golf.
The golf clubs would then be offered to women players, high handicap players, and low handicap players using all of the previous "trade secrets" set forth above.  Ultimately, the system of golf clubs, using all of the trade secrets set forth above will be tailored to very low handicap/scratch gold players, and for tour players.  The system of golf clubs would be marketed to these categories of players by emphasizing that each club can be altered, prior to the start of a round of golf, to accommodate the conditions, course,

5

hazards, and mechanics of the swing of the golfer, on any particular day.

Defs.' App. at 183-85.

### III.

### Grounds of the Motion

Defendants move for summary judgment on the following grounds:

1. As to Count I, that (1) Nike has not used any of plaintiff's seven alleged trade secrets, (2) plaintiff's alleged trade secrets were not trade secrets as of September 2000, and (3) there was no confidential relationship between Gillig and Stites;

2. As to Count II, that (1) there was no confidential relationship between plaintiff and Stites, (2) Nike has not used any of plaintiff's seven alleged trade secrets, and (3) the information disclosed by Gillig to Stites was well-known and not novel in September of 2000;

3. As to Count III, that (1) the undisputed facts show that there was no contract implied-in-fact between plaintiff and any of the defendants, (2) plaintiff disclosed nothing novel, and (3) in any event, Nike has not used any of the alleged trade secrets;

4. As to Count IV, that (1) plaintiff has not offered any evidence to support this count, (2) plaintiff did not

6

>           have protectable trade secrets, and (3) in any event,
>           Nike has not used any of plaintiff's alleged trade
>           secrets;
>
> 5.    As to Count V, that (1) plaintiff is not a consumer
>           under the DTPA, (2) the DTPA does not apply to
>           intangible property rights, (3) there is no evidence to
>           support the count, (4) plaintiff did not have
>           protectable trade secrets, and (5) in any event, Nike
>           has not used any of plaintiff's alleged trade secrets.

IV.

Summary Judgment Principles

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. Anderson, 477 U.S. at 256. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that

7

there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. Anderson, 477 U.S. at 248, 256. To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). An issue is material only if its resolution could affect the outcome of the action. Anderson, 477 U.S. at 248. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. Simmons v. Lyons, 746 F.2d 265, 269 (5th Cir. 1984).

The standard for granting a summary judgment is the same as the standard for judgment as a matter of law. Celotex Corp., 477 U.S. at 323. If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita, 475 U.S. at 597. See also Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

V.

<u>Analysis</u>

A.  <u>The Claims of Misappropriation of Trade Secrets</u>.

To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: (1) the existence of a trade secret; (2) defendant acquired the trade secret by breach of confidential relationship or other improper means; and (3) defendant used without authorization from plaintiff. <u>E.g.</u>, <u>General Universal Systems, Inc. v. Lee,</u> 379 F.3d 131, 149-50 (5th Cir. 2004).

The court has concluded that there is no summary judgment evidence that Nike used the first, second, third, sixth, or seventh alleged trade secrets. As the court found at the July 6, 2005, proceeding (as authorized by Rule 56(d) of the Federal Rules of Civil Procedure), the non-use by any defendant of the first, second, third, sixth, and seventh trade secrets is a fact that exists without substantial controversy. The undisputed summary judgment evidence and the evidence discussed at the July 6, 2005, proceeding establish that neither the CPR Wood nor the Slingshot Iron has an adjustable weighting system.[3] The first, second, third, sixth, and seventh alleged trade secrets quite

---

[3] By order signed May 19, 2005, the court ordered that "plaintiff not seek to offer at trial any proof of any misappropriation of a trade secret other than as to the CPR Wood line [of products] and Slingshot Iron line," and that "the proof as to those products be limited to the disclosures specifically made in the answer to Interrogatory No. 5, as contained in the document titled 'Plaintiff's Response to Defendants' Motion to Compel a Full and Complete Response to Interrogatory No. 5.'"

9

clearly contemplate an adjustable weighting system that would allow for adjustments by the users of the clubs.  This is made clear by the wording of the first alleged trade secret that the adjustment contemplated thereby would be accomplished by one of three methods: (1) use of a "sole plate, with a distinct weight distribution . . . [that] could be <u>removed or replaced</u> by a new sole plate"; (2) "insertion of <u>additional weight</u> into the hollow of the club"; or (3) "use of weighted metal bands . . . that could be <u>removed or replaced</u> by a metal band of different weight distribution."  <u>Supra</u> at 3 (emphasis added).  The parties agree that none of the three methods are used in the CPR Woods or in the Slingshot Irons, and that there is no provision for adjustment in the clubs.  Consequently, summary judgment should be granted defendants as to plaintiff's claim that defendants misappropriated the first, second, third, sixth, and seventh alleged trade secrets.

The parties agree that the fourth alleged trade secret is not used in either the CPR Woods or Slingshot Irons.  Therefore, summary judgment should be granted as to that alleged trade secret.  Consistent with the stipulation of the parties filed July 8, 2005, regarding the fifth alleged trade secret, the court is ordering dismissal of plaintiff's claims as to that alleged trade secret.

The rulings the court has made above dispose of the claims of misappropriation of trade secrets without the necessity for

10

the court to rule on the other grounds of the motion for summary judgment related to those claims. Nothing the court says in this memorandum opinion and order is to be taken as any indication of what the court would have ruled on defendants' other contentions.

B.   <u>Plaintiff's Other Claims</u>.

The disposition adverse to plaintiff of his contention that defendants misappropriated his alleged trade secrets is dispositive of his remaining claims because all of them are predicated on a determination that Gillig disclosed trade secrets to Stites, that Stites transferred the trade secrets to Nike, and that Nike then used the trade secrets in its manufacture and sale of golf clubs. Therefore, summary judgment is to be granted as to the remaining claims.

C.   <u>Defendants' Request for Affirmative Relief</u>.

In the prayer of their answer, defendants seek affirmative relief in the form of a permanent injunction and recovery of reasonable attorneys' fees. Defendants, through counsel, informed the court that they are agreeable to dismissal of those claims. The court has concluded that such a dismissal is appropriate.

11

VI.

<u>Order</u>

Therefore,

The court ORDERS that defendants' motion for summary judgment be, and is hereby, granted, except as to claims related to the fifth alleged trade secret;

The court further ORDERS that all claims asserted by plaintiff against defendants be, and are hereby, dismissed; and

The court further ORDERS that all requests by defendants for affirmative relief, other than their request to recover costs of court, from plaintiff be, and are hereby, dismissed without prejudice.

SIGNED July 13, 2005.

                                         /s/ John McBryde
                                      JOHN McBRYDE
                                      United States District Judge